1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                 NORTHERN DISTRICT OF CALIFORNIA

7

8   LAMONTE E. WILSON,                        No. C 07-1045 MHP (pr)

9            Petitioner,                      **ORDER DENYING HABEAS**
                                              **PETITION**
10        v.

11  BEN CURRY, warden,

12           Respondent.
    _____/

13

14                          **INTRODUCTION**

15        Lamonte Wilson, an inmate at the Correctional Training Facility in Soledad, filed this

16  pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now

17  before the court for consideration of the merits of the pro se habeas petition.  For the reasons

18  discussed below, the petition will be denied.

19                          **BACKGROUND**

20        Wilson was convicted in Merced County Superior Court of first degree murder and

21  was sentenced to 25 years to life in prison in 1991.  His habeas petition does not challenge

22  his conviction but instead challenges a November 15, 2005 decision of the Board of Parole

23  Hearings ("BPH") that had found him not suitable for parole.

24        The BPH identified the circumstances of the commitment offense and Wilson's failure

25  to accept responsibility for his role in the crime as the reasons for its decision that his release

26  would pose an unreasonable risk of danger to society or threat to public safety.  The BPH

27  also identified the circumstances of the commitment offense and Wilson's need for more

28  self-help and therapy to cope with the commitment offense as the reasons for its decision that

    another parole hearing would not be held for four more years.

**United States District Court**
For the Northern District of California

1   Wilson sought relief in the California courts.  The Merced County Superior Court

2   denied his petition for writ of habeas corpus in a short, but reasoned, decision.  The

3   California Court of Appeal summarily denied his petition for writ of habeas corpus and the

4   California Supreme Court summarily denied his petition for review.

5   Wilson then filed his federal petition for a writ of habeas corpus.  The court found

6   cognizable his claims that (1) his right to due process was violated because the evidence was

7   insufficient to support the BPH's decision that he was unsuitable for parole and (2) the BPH's

8   decision that to deny parole for four years was excessive and violated due process.  The court

9   ordered respondent to show cause why the writ should not issue on that claim.  Respondent

10  filed an answer and Wilson filed a traverse.

11  The court earlier indicated that it intended to wait for guidance from the anticipated en

12  banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527

13  F.3d 797 (9th Cir. 2008).  Wilson later filed a motion to lift the stay in this action.  That

14  motion is DENIED as unnecessary because the court never stayed this action.  (Docket # 7.)

15  Although much time has passed, Hayward remains pending in the appellate court and it is

16  unclear when the decision will be released.  The court will proceed to decide the merits of the

17  petition without the benefit of the Hayward decision.

18  **JURISDICTION AND VENUE**

19  This court has subject matter jurisdiction over this habeas action for relief under 28

20  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

21  action concerns the execution of the sentence of a prisoner housed at a prison in Monterey

22  County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

23  **EXHAUSTION**

24  Prisoners in state custody who wish to challenge collaterally in federal habeas

25  proceedings either the fact or length of their confinement are required first to exhaust state

26  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

27  highest state court available with a fair opportunity to rule on the merits of each and every

28  claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

2

1    dispute that state court remedies were exhausted for the claims asserted in the petition.

2                              **STANDARD OF REVIEW**

3           This court may entertain a petition for writ of habeas corpus "in behalf of a person in

4    custody pursuant to the judgment of a State court only on the ground that he is in custody in

5    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

6    The petition may not be granted with respect to any claim that was adjudicated on the merits

7    in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

8    was contrary to, or involved an unreasonable application of, clearly established Federal law,

9    as determined by the Supreme Court of the United States; or (2) resulted in a decision that

10   was based on an unreasonable determination of the facts in light of the evidence presented in

11   the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

12   362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

13   challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d

14   1123, 1126-27 (9th Cir. 2006).

15                              **DISCUSSION**

16   A.      Due Process Requires That Some Evidence Support a Parole Denial

17          A California prisoner with a sentence of a term of years to life with the possibility of

18   parole has a protected liberty interest in release on parole and therefore a right to due process

19   in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v.

20   Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442

21   U.S. 1 (1979); Cal. Penal Code § 3041(b).

22          A parole board's decision satisfies the requirements of due process if "some evidence"

23   supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

24   disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To

25   determine whether the some evidence standard is met 'does not require examination of the

26   entire record, independent assessment of the credibility of witnesses, or weighing of the

27   evidence.  Instead, the relevant question is whether there is any evidence in the record that

28   could support the conclusion reached'" by the BPH.  Sass, 461 F.3d at 1128 (quoting

                                           3

1    Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and

2    assures that 'the record is not so devoid of evidence that the findings of the . . . board were

3    without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472

4    U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law

5    in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.  As a matter of state

6    law, the parole authority's decision must also satisfy the "some evidence" standard of review.

7    See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review

8    properly is characterized as whether 'some evidence' supports the conclusion that the inmate

9    is unsuitable for parole because he or she currently is dangerous").

10          Having determined that there is a due process right, and that some evidence is the

11   evidentiary standard for judicial review, the next step is to look to state law because that sets

12   the criteria to which the some evidence standard applies.  One must look to state law to

13   answer the question, "'some evidence' of what?"

14   B.      State Law Standards For Parole For Murderers In California

15          California uses indeterminate sentences for most non-capital murderers, with the term

16   being life imprisonment and parole eligibility after a certain minimum number of years.  A

17   first degree murder conviction yields a minimum term of 25 years to life and a second degree

18   murder conviction yields a minimum term of 15 years to life imprisonment.  See In re

19   Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal

20   Code § 190.  The upshot of California's parole scheme described below is that a release date

21   normally must be set unless various factors exist, but the "unless" qualifier is substantial.

22          A BPH panel meets with an inmate one year before the prisoner's minimum eligible

23   release date "and shall normally set a parole release date. . . . The release date shall be set in a

24   manner that will provide uniform terms for offenses of similar gravity and magnitude in

25   respect to their threat to the public, and that will comply with the sentencing rules that the

26   Judicial Council may issue and any sentencing information relevant to the setting of parole

27   release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

28   panel "shall set a release date unless it determines that the gravity of the current convicted

4

offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."  Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

A critical issue in parole denial cases concerns the parole authority's use of evidence

about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[3]  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole.  Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his

sentence." <u>Irons</u>, 505 F.3d at 853.   Interpreting this statement from <u>Irons</u> to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the case.  The dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor <u>Irons</u> compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[4]

C.     Some Evidence Supports The BPH's Decision In Wilson's Case

1.     BPH Decision

The BPH identified the circumstances of the commitment offense and Wilson's failure to accept responsibility for his role in the crime as the reasons for its decision that Wilson's release would pose an unreasonable risk of danger to society or threat to public safety.  In its decision, the BPH observed that Wilson had numerous positive attributes, i.e., he had no other criminal history, had no substance abuse problem, had graduated high school and business school, had a good institutional record, had a supportive psychological report, was in individual counseling to deal with feelings of remorse and sorrow associated with the

1    commitment offense, had good parole plans, and had marketable skills to use upon release.

2    Resp. Exh. B, reporter's transcript of November 15, 2005 hearing ("RT") 78-80.

3    Nonetheless, the positive aspects of his behavior did not outweigh the factors of unsuitability.

4    RT 85.

5         The BPH also determined that the next parole suitability hearing would be deferred

6    for four years because he had been convicted of first degree murder and "it is not reasonable

7    to expect that parole would be granted at a hearing during the next four years," RT 81,

8    because of the circumstances of the commitment offense and because Wilson needed "more

9    self-help and therapy in order to cope with [his] crime." RT 84.   The BPH felt that Wilson

10    was minimizing his role and not being candid about the murder.  RT 85.

11         For the reasons discussed below, the court concludes that the BPH was fully justified

12    in believing that the crime was committed in an especially cruel and callous manner and that

13    Wilson was minimizing his role in the crime.  Although Wilson claimed at the hearing and

14    here that he took responsibility for the crime, he said it was for failing to stop his co-

15    defendant from beating the victim.  Much like the strangler who "admits" he is at fault for

16    failing to give the victim mouth-to-mouth resuscitation, Wilson's acceptance of responsibility

17    rings hollow.  To see why, it is necessary to consider the details of the murder and events

18    leading up to it, as well as Wilson's statements at the parole hearing.

19              a.    Commitment Offense

20         In the early morning hours of September 15, 1989, Tracia Cowan was beaten to death

21    with a baseball bat in a park.  Police officers apprehended her husband (David Cowan) and

22    Wilson near the killing.  The police had been summoned by a neighbor who heard a woman

23    screaming and saying "no" between the screams.  Another neighbor "also heard a 'high-pitch

24    terrifying sound' and someone saying 'no, no' several times. . . . [H]e also heard 'tinging'

25    sounds – sounds which reminded him of the noise made when hitting a stake into the

26    ground."  Resp. Exh. C, Cal. Ct. App. Opinion, p. 4.

27         The autopsy performed by Dr. Murdock revealed that the victim had received multiple
     lacerations of the scalp and face as well as multiple skull fractures around the right
28    side of her face with a portion of the brain being exposed.  There was a four inch long
     hole in the victim's skull.  Some of the victim's teeth were avulsed and she exhibited

defense wounds on her hands, arms, and shoulders.  The doctor performing the autopsy believed that the victim received in excess of a dozen blows.

Resp. Exh. C, Cal. Ct. App. Opinion, p. 13.  The motive for the killing was that the victim's husband (David Cowan) had troubles with his wife, but did not want to get divorced because he would lose his daughter and owe child support.  Wilson was Cowan's friend.

The BPH had available to it the California Court of Appeal's 1993 opinion, which described many items of evidence in rejecting Wilson's contention that there was insufficient evidence to support his conviction for first degree murder.  The court went though the evidence of planning, motive and manner of the killing, which were not elements of the crime but were probative on the question of premeditation and deliberation necessary for a first degree murder under California law.  See id. at 7.

There was substantial evidence of planning by Wilson and Cowan.  The police found two notes written by Wilson that were "suggestive of the existence of a preconceived plan to kill the victim."  Id. at 8.  The first note indicated the payment plan for hiring a killer  Id.  The second was an outline indicating a plan and an alternate plan for killing.  The first plan called for hiring someone and paying him in halves.  The part of the note labeled "Alternative Plan" listed eight steps, including "phone off hook," "take her down," "kill her good," "leave car with key perfect set up," and "drive back to your house."  Id.

Wilson admitted during questioning that he had written the notes, and that he and Cowan had several conversations about killing the victim, including plans to shoot or drug her.  Id.  As to the alternative plan – which the court noted "most closely parallels what actually transpired in this case," id. at 9 – Wilson explained to the police the meaning of each of the listed steps.  The first step and the last few steps were to avoid detection by establishing an  alibi.  As to the middle steps, Wilson "explained that the phrase '[t]ake her down' meant to take the victim to the place where the killing was going to occur.  'Kill her good' referred to making certain that she was dead."  Id.  at 9.  Wilson first said he wrote the information simply because Cowan asked him to do so; later, he said he wrote the plan because Cowan was busy tending to his daughter and had bad handwriting, and that Cowan "wanted the note to be legible to the people in Pittsburgh who he planned to hire to murder

1    his wife." Id. at 10.  Wilson admitted having several conversations about the killing

2    beforehand, including a discussion a week before the actual killing during which he and

3    Cowan considered hiring someone from Pittsburgh, Pennsylvania – where they were both

4    from – to shoot the victim while she was there visiting relatives.  Id.

5         Cowan also talked to police detectives.  After first denying any plan, he later

6    "acknowledged having had a discussion with [Wilson] only two to three days before the

7    killing about the park being a possible murder site.  He also stated that [Wilson] had actually

8    contacted someone in Pennsylvania to kill the victim but that Cowan had taken action to stop

9    it.  Cowan admitted that there had been other discussions about murdering his wife, but

10   denied directing [Wilson] to write any of them down." Id. at 11 (footnotes omitted).

11        There was evidence of a prior relationship between Wilson and the deceased – the

12   significance of which is that some prior relationships might provide information from which

13   the trier of fact can infer a motive for a killing.  Wilson maintained that he did not

14   particularly like the victim, but he did not dislike her enough to want to kill her.  However,

15   he admitted during interrogation that Cowan had told him two days before the killing that the

16   victim had expressed a desire to locate someone to kill him (i.e., Wilson).  The court thought

17   this was "a strong indicator that the relationship between appellant and the victim was

18   significantly worse than appellant was willing to openly admit." Id. at 12.

19        The appellate court then discussed the evidence regarding the manner of killing.  The

20   evidence showed that the beating had been brutal.  The victim had sustained multiple skull

21   fractures; she had a four-inch long hole in her skull and part of the brain was exposed.  Some

22   of her teeth were knocked out.  Her injuries were consistent with having been beaten by a

23   baseball bat.  The court of appeal observed that both Cowan and Wilson admitted hitting the

24   victim with the bat. Id. at 13.  (This is significant because, at the parole hearing, Wilson

25   denied striking the victim with the bat.)   In rejecting the argument that the evidence allowed

26   a finding that Cowan killed in a flash of anger, the court explained that the overall record,

27   which included not only the manner of the killing but also Wilson's handwritten notes,

28   "provides ample evidence upon which a reasonable trier of fact could find that the manner of

1  killing in this case was carried out pursuant to a preconceived plan – the alternative plan."

2  Id. at 14.   The appellate court then went point-by-point through the "alternative plan" outline

3  Wilson had written and showed how the evidence supported most of the points, and

4  especially how Wilson actively took part in preparing for the event, including the following:

5  discussions between the co-defendants about the possibility of doing the killing in the park,

6  the odd choice of the park as a meeting place if the meeting was for reconciliation purposes,

7  Wilson's misleading statements to someone days before the killing about why he wanted to

8  borrow a car on the night of the killing, Wilson's uncommon all-black attire that evening, and

9  Wilson's driving the borrowed car near the park after dark without using the headlights that

10  would allow a reasonable trier of fact to conclude he was driving without his lights on to

11  avoid detection.  Id. at 14-18, 22.

12  Despite Wilson's insistence that he did not participate in the actual killing, the state

13  court of appeal found that there was evidence that would allow the trier of fact to conclude

14  that he was an active participant.  Even if, as Wilson claimed, he had only been in a fist fight

15  with the victim, that could be construed as making the victim more vulnerable to the

16  impending baseball bat beating by Cowan, of which Wilson was aware.  Id. at 19.  The

17  evidence of his active participation included Cowan's statement that he observed Wilson

18  standing over the victim and hitting her with the bat.  Cowan's statement was supported by a

19  bloody footprint on the inside of the victim's shirt between the elbow and shoulder that was

20  consistent with the pattern and size of Wilson's right shoe.  "Based on this evidence, a

21  reasonable trier of fact could find the placement of the footprint to be consistent with

22  appellant trying to restrain the victim while standing over her and hitting her with the bat."

23  Id. at 20.  The victim's blood was spattered on Wilson's pants and shoes, suggesting that he

24  was in close proximity to the beating.  Also, before her death, the victim had accused the

25  defendants of planning to jump her in the park.  Lastly, Wilson had told police, "'I guess my

26  friend wanted me to help him kill his wife,'" when first apprehended by officers the night of

27  the killing.  Id. at 21.

28  In finding Wilson unsuitable, the BPH stated:  "The offense was carried out in a

11

dispassionate and calculated manner, in that the record suggests the murder was preplanned, that is luring the victim to a park where she was ambushed and killed.  The offense was carried out in a manner that demonstrates an exceptional callous disregard for human suffering, in that the victim suffered prolonged severe trauma physical – physically and emotionally prior to her death, having been beaten with a blunt instrument.  The motive for the crime was inexplicable and very trivial in relation to the offense, in that the crime partner wanted to eliminate his wife."  RT 77-78.

          b.       <u>Failure To Accept Responsibility/Need For More Therapy or Self-Help</u>

At the parole consideration hearing, Wilson purported to accept responsibility but did it in a way that indicated his role in the killing was quite limited.  When the discussion of the commitment offense started, a BPH commissioner asked if he committed the offense.  Wilson responded: "Yes, I did.  I stipulate to the facts."  RT 15.  Wilson argues here that this statement should be the end of the matter, and that the BPH unreasonably determined that he had not accepted responsibility.  However, the transcript of the discussion that follows that purported admission shows the basis for the BPH's concern.  <u>See</u> RT 15-38.   Wilson attributed his involvement to immaturity, made it sound like the trip to the park was spontaneous, claimed to be shocked when Cowan started hitting the victim with the bat, and indicated they contemplated taking the victim to the hospital.  When asked how he felt about what he did or failed to do, Wilson responded that he took "the blame for all of this because I had the power, I believe, to stop this whole ordeal."  RT 25.  He felt he could have "stopped [Cowan], or at least talked him out of it, you know, doing any of this, but I was immature."  RT 25.  As to his role in the park on the night of the killing, Wilson would only admit that he had a fist fight with the victim and that he picked up the bat and threw it at her.  RT 22.

The BPH found that he had failed to accept responsibility.  As one of the commissioners told Wilson, "You've done what I call accepting qualified responsibility.  You kind of paint it your way, but as she [i.e., another commissioner] pointed out, you've omitted some extraordinarily significant portions of what went down."  RT 32.

          2.       <u>State Court Decision</u>

1    The Merced County Superior Court rejected Wilson's habeas in a decision that was

2    reasoned, but did not discuss the sufficiency of the evidence claim that he had presented to it.

3    See Resp. Exh. F.  The California Court of Appeal and the California Supreme Court

4    summarily rejected Wilson's petitions.   See Resp. Exhs. G and H.

5    Where, as here, the state court gives no reasoned explanation of its decision on a

6    petitioner's federal claim and there is no reasoned lower court decision on the claim, a review

7    of the record is the only means of deciding whether the state court's decision was objectively

8    reasonable.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006);  Himes v.

9    Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  When confronted with such a decision, a

10   federal court should conduct "an independent review of the record" to determine whether the

11   state court's decision was an objectively unreasonable application of clearly established

12   federal law.  Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

13          3.    Analysis Of Federal Claims

14   The BPH considered circumstances and factors proper under California law.  A

15   circumstance tending to indicate unsuitability for parole is that "the prisoner committed the

16   offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs. §

17   2402(c)(1).  Beating someone to death with a baseball bat certainly qualifies as especially

18   cruel, especially a beating that knocks out teeth and puts a large hole in the skull. There was

19   evidence that Wilson took part in the hitting, and was not merely standing by as his partner in

20   crime did the hitting.  The need for further therapy and self-help to accept responsibility for

21   his part in the crime is not specifically listed as a circumstance tending to indicate

22   unsuitability under § 2402(c), but may be considered under § 2402(b), which provides that

23   "[a]ll relevant, reliable information available to the panel shall be considered in determining

24   suitability for parole," including his "past and present attitude toward the crime."  Also, it

25   shows the absence of one of the circumstances listed as tending to indicate suitability for

26   parole.  See 15 Cal. Code Regs. § 2402(d)(3).  The BPH's ultimate conclusion was cast in

27   terms of the requirement of California law, i.e., that Wilson was not suitable for parole and

28   "would pose an unreasonable risk of danger to society or a threat to public safety if released

13

1    from prison."  RT 77; <u>see</u> <u>Lawrence</u>, 44 Cal. 4th at 1191.

2        Wilson argues strenuously that the BPH was wrong in believing he had minimized his

3 role in the killing.  He states that the "entire record" was supplied by him, that there was "no

4 other way to gain information or interpret the events that took place but by what petitioner

5 and petitioner only supplied to the investigating officer," Traverse, p. 1, and that he accepted

6 responsibility and admitted his role in the offense by stating that he stipulated to the facts.

7 The BPH was fully justified in believing that Wilson was minimizing his role in the crime

8 because his alleged admission of responsibility was for failing to stop his partner from going

9 forward with the killing.  The BPH was not required to believe his version of the killing –

10 especially since his failure-to-intervene story was inconsistent with the first degree murder

11 conviction.

12        The BPH recognized that there was much to be commended about Wilson and his

13 performance in prison.  However, and notwithstanding all the positive factors for Wilson, the

14 BPH determined that, 16 years into his 25-to-life sentence, the murder plus his failure to

15 recognize his role in it showed that he posed an unreasonable risk of danger to society if

16 released from prison.  Significantly, Wilson had not yet served the minimum number of

17 calendar years required by his sentence.  <u>See</u> <u>Irons</u>, 505 F.3d at 853.  The BPH did not act

18 arbitrarily or capriciously or without some evidentiary support in determining that Wilson

19 currently presented an unreasonable risk of danger to society if released from prison.

20 Bearing in mind that the court's chore is to consider not whether some evidence supports the

21 reasons, but whether some evidence supports the conclusion that Wilson's release

22 unreasonably endangers public safety, this court concludes that there was some evidence to

23 support the BPH's conclusion.   The Merced County Superior Court's rejection of his

24 insufficient evidence claim was not contrary to or an unreasonable application of the

25 <u>Superintendent v. Hill</u> some evidence standard.  Wilson is not entitled to the writ.

26 B.      <u>Four-Year Denial Of Parole</u>

27        Although annual parole consideration was the rule many years ago, the relevant

28 statute has been amended several times to let the parole authority defer future parole hearings

for multiple years.   See Cal. Penal Code § 3041.5.  At the time of Wilson's parole hearing, California law provided for annual parole consideration but provided that the parole authority could schedule the next hearing up to five years "if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing."  Cal. Penal Code § 3041.5(b)(2)(B).

Wilson contends that the decision of the BPH to defer his next parole consideration hearing for four years was excessive in violation of his constitutional rights under the Fifth, Eight and Fourteenth Amendments to the U.S. Constitution.  He argues that the four-year deferral violated his right to due process because it was "excessive and contrary to his liberty interest of a fair and impartial hearing."  Petition attachment, p. 5.

Wilson has not shown any violation of any due process right under the Fourteenth Amendment.  Even assuming he had a federally-enforceable right to have the state comply with the statute, that was done here.  Section 3041.5(b)(2)(B) plainly allowed the parole board to defer the next hearing for up to five years upon certain conditions.  Those conditions existed here: Wilson had been convicted of murder and the board had found that it was not reasonable to expect that parole would be granted during the next four years.  RT 81. Wilson had been in prison 14 years on his 25-to-life sentence at the time of the hearing.   As explained earlier in this order, this was an unusually cruel murder and Wilson continued to minimize his role in the murder.

Wilson's claims under the Fifth and Eighth Amendments to the U.S. Constitution have no merit.   The Fifth Amendment's Due Process Clause applies to the federal government and not the state governments.  Wilson's Eighth Amendment claim fails because he is within his maximum term of life imprisonment.  Since a sentence of life imprisonment without the possibility of parole does not violate the Eighth Amendment, see Harris v. Wright, 93 F.3d 581, 583-85 (9th Cir. 1996), it follows that there would not be an Eighth Amendment violation in the lesser sentence of life with the possibility of parole, or in whatever number of years the life prisoner must serve on his sentence for a murder.  The state court's rejection of

1  the challenge to the BPH's decision to schedule Wilson's next parole suitability hearing in

2  four years was not contrary to, or an unreasonable application of, clearly established federal

3  law as set forth by the U.S. Supreme Court.

## CONCLUSION

5        For the foregoing reasons, the petition is denied on the merits.  Petitioner's motion to

6  lift the stay is DENIED as unnecessary because a stay was never imposed.  (Docket # 7.)

7  The clerk shall close the file.

8        IT IS SO ORDERED.

9  DATED: February 25, 2010

                                                    _____
10                                                   Marilyn Hall Patel
                                                    United States District Judge

16

1

## NOTES

2

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

2.      The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  <u>See Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority.  Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

3.      <u>En banc</u> review is now pending in a fourth case regarding the some evidence standard, <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir. 2008).  The order granting <u>en banc</u> review states that the panel opinion is of no precedential value.

4.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to public safety."  <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole in <u>Shaputis</u>.

17